# Exhibit 1

**COLLABORATIVE PROPERTY AND SUPPORT SETTLEMENT AGREEMENT**

This Agreement, made this 24th day of February, 2023, by and between IEVA M. AUGSTUMS, hereinafter referred to as "Ieva", and DAVID TODD HARRIS, hereinafter referred to as "Todd",

**WITNESSETH:**

WHEREAS, the parties were married on September 14, 2013, in Beaver Creek, Colorado, but separated on September 11, 2022, and intend hereafter to live separate and apart; and

WHEREAS, there have been 2 children born of the marriage, to-wit: Emilija Grace Harris, born April 2, 2015 and Sabine Viktorija Harris, born February 23, 2017; and

WHEREAS, it is expressly understood and agreed that this Agreement is not executed either for the purpose of the parties obtaining a divorce from each other, or as an agreement or consent by either party for the other to obtain a divorce; and

WHEREAS, it is the desire of the parties to make a full, final, complete and equitable property division and to make a complete and final settlement, adjustment, compromise, and determination of all rights of support and maintenance by either party against the other by reason of their marriage, all dower, curtesy, support and homestead rights, and any and all other rights arising from the marriage relation including the right to share in the augmented estate of the other; and

NOW, THEREFORE, in consideration of the premises and the mutual undertakings herein contained, the parties agree as follows:

1. FREEDOM FROM RESTRAINT AND INTERFERENCE. The parties shall hereafter be free from the authority or control of the other as fully as if unmarried. The parties shall not molest, harass, annoy or interfere with one another at their respective places of residence or employment, on the streets or elsewhere, or compel or endeavor to compel the other to cohabit or dwell with him or her.

2. BINDING ON HEIRS AND ASSIGNS. All covenants, promises, stipulations, agreements, and provisions set forth in this Agreement shall apply to, bind, and be obligatory upon the heirs, executors, administrators, personal representatives, and assigns of the parties. The authority for each party's personal representative to comply with the terms of this Agreement is granted by the parties' signatures hereto before a notary public.

3. PRIOR AGREEMENTS INVALIDATED. The parties, in consideration of the covenants herein contained, hereby cancel, annul, and invalidate any and all prior property or other settlements made by them with the exception of the Collaborative Participation Agreement entered into between the Parties dated on October 14, 2022, the terms of which shall remain effective except as implicitly or expressly superseded by the provisions of this Agreement.

4. PARENTING PLAN. Child custody and parenting time is resolved in a separate agreement, signed contemporaneously with this Agreement.

5. DISPOSITION OF PERSONAL PROPERTY. The parties agree to the following disposition of personal property:

(a) Motor Vehicles Ownership. Motor vehicle ownership shall be as follows:

| Description | Present Ownership | Ownership Hereafter |
|---|---|---|
| 2017 Mercedes | Joint | Ieva |
| 2017 Volkswagen Tiguan | Joint | Ieva |
| 2015 BMW X3 | Joint | Todd |
| | | |

The parties shall indemnify, defend, and hold one another harmless as to the operation, maintenance, and all financial responsibilities arising out of his or her ownership of any such vehicle. Transfer of title, if and as required, shall occur within 30 days following execution of this Agreement.

(b) Household Furniture and Effects. Household furniture and effects shall be dealt with as follows:

(i) Both Ieva and Todd shall keep the items they brought into the marriage, and the items they received during the marriage from inheritance or gift outside the marriage.

(ii) Ieva shall keep 120 bottles of the parties' wine collection, determined reasonably by taste, preference, and price. She shall also keep the family room blue rug and the Anne Packard painting. Todd shall receive the rest of the wine and the Tony Dow sculpture. These shall be with no cash offset.

(iii) Todd and Ieva shall both keep their own personal items, to include clothing, jewelry, watches, and other similar items, with no cash offset.

(iv) Todd and Ieva shall divide up the remainder of their movable personal property like furniture and furnishings, artwork, and kitchenware, in a reasonable manner, with no cash offset.

(v) In the event there is any disagreement over which items are a party's separate property or personal items, which bottles of wine each gets, or division of the remainder of the personal property pursuant to (iv) above, the parties shall return to the Collaborative process to attempt to resolve the issue. In the event they are unsuccessful, then they agree to submit the issue of division of any items which remain in dispute to an independent arbitrator with binding authority to identify and value such assets, and to equally distribute same between the parties based on value. In the arbitrator's sole discretion, he or she may order an asset or assets sold and the proceeds from sale divided. Said arbitrator shall be selected by agreement of the parties or their counsel, or in the event of their inability to agree, shall be appointed by the court upon petition of either party. The arbitrator's cost shall be evenly divided between the parties, but the arbitrator may, in his or her sole discretion, to allocate the costs to one party or another as the arbitrator deems appropriate.

(c) Liquid Assets.

(i) Waiver. Except as otherwise set forth in this Agreement, any and all liquid assets, including all accounts in financial institutions, certificates of deposit,

money market accounts, stocks, bonds, mutual funds or other securities, now deposited, listed, or registered in the individual name of either party, or jointly in the name of such party and a third-party individual or entity, shall remain his or her sole and separate property. Each party hereby waives any right, title, or interest in any such liquid assets which are titled or registered in the name of the other party, individually or jointly with any third-party individual or entity.

(ii) Bank of America Accounts. Regarding the parties' joint Bank of America accounts, these shall be the sole and separate property of Ieva. Todd shall not use these accounts after this Agreement is signed, and the parties shall cooperate to remove his name from them.

(d) Business or Investment Entities Owned by Todd. The parties acknowledge that Todd has ownership of a certain business or investment entity known and identified as Harris Communications, as well as an ownership interest in a business known as Something Else Strategies, LLC. Todd also has ownership interests in businesses known as Zignal Labs, and Coign. Todd shall continue to own these interests as his sole and separate property, free of any claim of right or entitlement on the part of Ieva. Ieva waives any right or interest in same, and in the assets of any such entity. Todd shall be responsible for any and all expenses and liabilities arising out of or in connection with same, and shall indemnify, defend, and hold and save Ieva harmless as to any such expense or liability. Todd and Ieva also own a business known as Inkdance Properties,

which is solely an entity that holds and administers their Florida property. This shall be dealt with in the section on the Florida property below.

6. RETIREMENT WAIVER. Each party hereby waives any right, title, or interest he or she may have (past, present, or future) to any defined benefit and defined contribution retirement account of any kind whatsoever, including but not limited to pensions, Thrift Savings Plans (TSPs), Individual Retirement Accounts (IRAs), 401(k) accounts, 403(b) accounts, 457(b) accounts, profit sharing plans, or any and all other retirement benefits that are titled or registered in the name of the other party, individually or jointly with any third party individual or entity.

7. REAL PROPERTY.

(a) 6004 Woodley Road, McLean, Virginia. The parties own, as tenants by the entirety, property located at 6004 Woodley Road, McLean, Virginia. Todd, within 10 days following presentation to him of an appropriate deed, shall assign, convey, and transfer by Special Warranty Deed to Ieva all his right, title, and interest in this property, and to execute any and all documents necessary to effect said transfer. Ieva shall be solely responsible for all expenses arising out of or in connection with said property with the exception of the mortgage and repair expenses listed below. Ieva's counsel shall prepare and record, at Ieva's expense, an appropriate deed and other documents necessary to effect the aforesaid transfer. Payment of the mortgage and expenses of this property, as well as potential refinance by Ieva is dealt with below.

(i) Repairs. Todd shall pay for the repairs needed for the fireplace as identified in the recent inspection (anticipated to be in excess of $15,000), as well as all associated carpentry, painting, metal grating, etc. Todd and Ieva shall divide (85% Todd, 15% Ieva) the cost of any repairs required by Fairfax County relative to storm water management that are required after an inspection by the County that is scheduled to take place at some point in year 2023. Todd shall pay to Ieva the sum of $15,000 by July 1, 2023, and Ieva shall be solely responsible for any other repairs she wishes to make to the property, except repairs caused by Todd or his movers, in which case he shall pay for those.

(ii) Mortgage and Potential Sale.

(1) Mortgage Prior to Todd's Relocation. Todd shall timely pay the monthly mortgage payment (to include principal, interest, and homeowner's insurance comparable to that which is currently in place) on the note encumbering the Woodley Road property from the date this Agreement is executed forward until Todd's Relocation.

(2) Mortgage After Todd's Relocation for 84 Months. Todd shall timely pay the monthly mortgage payment (to include principal, interest, and homeowner's insurance comparable to that which is currently in place) for 84 months beginning with the first month after Todd's Relocation. Todd shall be permitted to recast this mortgage once for a new 30-year term, paying the first installment ($260,000) of the monetary award set forth in Paragraph 8 of this Agreement toward the principal of the

mortgage in connection with the recast. In the event the recast mortgage payment is more than $6,000 per month, Todd shall pay the full amount of the mortgage. Once the recast goes into effect, Todd shall pay $6,000 per month or the mortgage (PITI) payment, whichever is greater, for so long as he is obligated to pay the mortgage. If the mortgage (PITI) payment is less than $6,000, the excess amount paid shall be applied to the principal of the mortgage balance. This obligation to pay the mortgage shall be subject to the termination provisions of the Spousal Support section in this Agreement.

(3) Mortgage after Todd's Obligation. At the conclusion of Todd's obligation to pay the mortgage, Ieva shall have the obligation to timely pay the mortgage until the sale of the property or refinance of the mortgage. If Ieva chooses to refinance the mortgage encumbering the property, she shall have 12 months from the completion of Todd's obligation to pay the mortgage to remove Todd's name from the mortgage either through refinance, assumption, or sale. In the event that Ieva lists the property for sale, it shall be listed for sale and sold in a commercially reasonable manner, with Ieva to receive all net proceeds of sale and any balance of escrow proceeds.

(iii) Residence in the House and Todd's Relocation. Both Ieva and Todd will be permitted to remain in the Woodley Road property until September 30, 2023, at which point Ieva shall have exclusive use and possession of the property. "Todd's relocation," as that term is used in this Agreement, means Todd's physically moving out of the property and removing all his movable personal property as well. If Todd inadvertently leaves behind his personal property or property that was previously

agreed to be his, upon discovery that the item has been left behind, the parties shall cooperate to arrange for Todd to retrieve the item(s) as soon as possible.

(b) Shenandoah Land. The parties own, as tenants by the entirety, approximately 17 acres of raw land in the Shenandoah valley of Virginia. Ieva, within 10 days following presentation to her of an appropriate deed, shall assign, convey, and transfer by Special Warranty Deed to Todd all her right, title, and interest in this property, and to execute any and all documents necessary to effect said transfer. Todd shall be solely responsible for all expenses arising out of or in connection with said property, including, but not limited to, taxes, assessments, mortgage amortization and interest, repairs, and insurance, and shall indemnify, defend and hold Ieva harmless therefrom. Todd's counsel shall prepare and record, at Todd's expense, an appropriate deed and other documents necessary to effect the aforesaid transfer.

(c) 19906 Front Beach Road, Panama City Beach, Florida. The property located at 19906 Front Beach Road, Panama City Beach, Florida is owned by an LLC known as Inkdance Properties. The parties are the joint owners of Inkdance Properties. The property is currently listed for sale and shall remain listed for sale until sold or Todd removes Ieva's name from the mortgage and all other liabilities, whichever occurs first. The net proceeds or deficiency of sale (defined as sales price, less all mortgage/trust balances, liens, lines of credit, broker commissions, attorney fees, and other usual and customary sales and closing costs) shall be Todd's sole and separate property. If Todd

removes Ieva's name from the mortgage and all other liabilities instead of selling, Ieva shall execute a Deed transferring her interest in the property to Todd.

Any amounts held in escrow (e.g., real estate taxes and/or insurance) and returned hereafter by the lender to the settlement agent or the parties, or either of them, shall be Todd's sole and separate property.

Todd, until settlement following sale of said property, is hereby given the right of exclusive use and occupancy thereof, rent-free. During such period of occupancy, Ieva shall not institute any action for partition, or any other form of litigation seeking to terminate such right of occupancy. Todd shall be responsible for, and shall pay, all expenses associated with the property including the mortgage (including principal, interest, taxes, and insurance), utilities, assessments, repairs, and insurance, and shall indemnify, defend, and hold Ieva harmless therefrom, until settlement as to sale of the property.

The parties shall cooperate fully with any real estate agent or realtor wishing to show the property. Both parties, in the event of presentation of a purchase contract as to the property, shall cooperate fully with the real estate agent(s) and/or broker(s) involved in the prospective sales transaction, and shall cooperate in responding expeditiously, meaningfully, and appropriately to any purchase offer so as to effect sale of the property. Todd shall have sole discretion regarding the acceptance or rejection of a purchase offer.

Todd shall report and recognize on his individual income tax return the taxable gain or loss on the sale on his tax return as appropriate.

8. MONETARY AWARD. Todd shall pay to Ieva, as a monetary award, neither deductible by Todd, nor taxable to Ieva, for income tax purposes, the sum of $500,000, payable as follows:

| Date of Payment | Amount of Payment |
|---|---|
| Within 15 days after sale of the Florida house | $260,000 (to be applied to the mortgage as noted above) |
| July 1, 2024 | $60,000 |
| July 1, 2025 | $60,000 |
| July 1, 2026 | $60,000 |
| July 1, 2027 | $60,000 |

No interest shall accrue or be payable as to the aforesaid monetary award unless same is not paid within ten days following the due date as referenced above, in which event interest shall accrue retroactively to the due date and shall continue to accrue at Virginia's statutory judgment rate until payment of the monetary award. Todd may pay any portion of the monetary award prior to the due date without any penalty.

9. SPOUSAL SUPPORT. Todd shall pay to Ieva, as spousal support, the sum of $15,000 per month for 48 months, followed by the sum of $12,000 per month for 36 months; and the mortgage payments set forth in this Agreement shall be deemed to be spousal support payments. The initial payment shall be made on the first day of the month following Todd's relocation from the Woodley Road property as described above, and to continue in consecutive monthly installments on the first day of each month thereafter until the first of the following to occur: 1) the death of either party; 2) Ieva's remarriage; 3) upon order of a court of competent jurisdiction based upon clear and convincing evidence that Ieva has been habitually cohabiting with another person in a

relationship analogous to marriage for one year or more unless Ieva proves by a preponderance of the evidence that termination of such support would be unconscionable; or 4) a total of 84 monthly payments are made. Todd's obligation to make mortgage payments as set forth in this Agreement are subject to this termination language as they are considered to be part of his spousal support obligation.

The amount or duration of spousal support contained in this Agreement is not modifiable except as specifically set forth in this Agreement. The duration of support shall be non-modifiable. The amount of support shall be modifiable only in the event that Todd becomes disabled and as a result is unable to continue his current employment.

Todd shall promptly implement an allotment from his checking or other bank account, payable to Ieva by direct deposit into an account Ieva shall designate, as payment of Todd's spousal support obligation as set forth in this Agreement. Todd shall maintain said allotment in effect for so long as he has an obligation to pay spousal support to Ieva. The aforesaid allotment shall be established by Todd in a manner to assure receipt by Ieva in her designated account of spousal support on or before the first day of each month.

Todd hereby waives and releases any rights that he may have for support and maintenance, and agrees that he will at no time hereafter seek or ask, in any manner, any monies of any nature from Ieva, or seek a reservation of right to spousal support; and further, that if proceedings in divorce are or have been instituted by either of the parties, he will not in such proceedings make any such demand.

10. CHILD SUPPORT.

(a) Amount and Duration of Payment. Todd shall pay to Ieva the sum of $4,000 per month for the support and maintenance of their minor children, the first payment to be made on the first day of the month following Todd's relocation from the Woodley Road property as described above, and to continue as to the children in consecutive monthly installments on the first day of each month thereafter until a child attains the age of 18 years, provided that support shall continue to be paid for any child over the age of 18 who is (i) a full-time high school student, (ii) not self-supporting, and (iii) living in the home of the party seeking or receiving child support until such child reaches the age of 19 or graduates from high school, whichever first occurs. The court may also order the continuation of support for any child over the age of 18 who is (i) severely and permanently mentally or physically disabled, (ii) unable to live independently and support herself, and (iii) resides in the home of the parent seeking or receiving child support.

(b) Timeliness of Payments. All payments for support shall be made so that Ieva actually receives the payment on or before the due date at her residence or at such other place designated by her to Todd by prior written notice.

(c) Child Support Computation Method. The parties acknowledge and agree that they are aware of and understand the Virginia statutes applicable to child support, i.e., §§20.107.2, 20-108.1, and 20-108.2 of the 1950 Code of Virginia, as amended. The parties' Parenting Plan grants both parties equal parenting time, however,

due to Todd's work commitments, the parties anticipate that the children will spend more than 50% of the time (particularly in election years) with Ieva. Taking this likelihood into consideration and the expectation that Ieva will likely pay for all or the bulk of the children's extracurricular activities with these funds, Todd has agreed to pay child support in an amount that exceeds the presumptive child support guidelines.

(d) Payment by Allotment. Todd shall promptly implement an allotment from his checking or other bank account, payable to Ieva by direct deposit into an account Ieva shall designate, as payment of Todd's child support obligation as set forth in this Agreement. Todd shall maintain said allotment in effect for so long as he has an obligation to pay child support to Ieva. The aforesaid allotment shall be established by Todd in a manner to assure receipt by Ieva in her designated account of child support on or before the first day of each month.

(e) Work-related child care. Each party shall be solely responsible for paying for any child care provided by a third-party during his or her parenting time. In the event child support is modified by a Court of competent jurisdiction, the parties agree that any work-related child care shall not be included in any such calculation that occurs prior to the expiration of 48 months after child support payments begin under this Agreement.

11. PAYMENT OF EXPENSES UNTIL TODD RELOCATES FROM THE WOODLEY ROAD PROPERTY. The parties shall maintain the status quo until Todd's relocation from the Woodley Road property as described above. The status quo means that Todd shall pay the household expenses that he has traditionally paid, the mortgage,

and he shall pay the monthly difference between the current mortgage (minimum PITI due) payment and $21,000 directly to Ieva by the first day of each month. If Todd's recasts the mortgage prior to Todd's Relocation, he shall retain the savings associated with the recasting. Ieva will continue to pay the expenses she has traditionally paid.

12. COLLEGE SAVINGS ACCOUNTS. The parties currently have the following accounts designated for their children's college savings:

| Description | Approximate Present Value | Present Ownership | Beneficiary |
|---|---|---|---|
| 529 Plan | $104,768 | Todd | Emilija |
| 529 Plan | $100,303 | Todd | Sabine |

Todd shall maintain the accounts in his name hereafter and Ieva shall be named as the successor owner. Ieva shall be granted online access to view the accounts, but shall not make any changes to them without Todd's written approval. The accounts shall be used only for the post-secondary education of the child who is the beneficiary of each particular account except as expressly set forth below. These accounts shall be exhausted before any party or child is required to contribute to the cost of an expense that could have been paid using the accounts. If any funds in a particular account are not used for that account beneficiary's post-secondary education prior to that child's graduation, reaching the age of 23 (unless said child's education shall have been involuntary interrupted by military service, illness, or similar event beyond the control of said child, in which event such obligation shall be extended for a period of time equal to such involuntary interruption), or discontinuing her education under circumstances whereby it

is unlikely she will continue that education prior to age 23, the funds in any accounts designating that child as the beneficiary shall be transferred, if possible, to the next-eldest child, and so on, until they can no longer be used for any child of the parties according to the terms of this section. At that point, any remaining funds in any accounts less applicable tax and/or penalties shall be evenly divided between the parties.

13. <u>CHILD DEPENDENCY EXEMPTION/TAX CREDIT</u>.

In all tax years going forward, Ieva shall have the right to claim both children as dependents, and thereby as exemptions, for federal and state income tax purposes and shall therefore be permitted to claim any deductions and/or credits derived from same, including but not limited to the child tax credit. This section may be modified in the event of a material change in circumstances.

The parties agree to execute each year, and provide the applicable party by no later than March 1, Internal Revenue Service form 8332, and/or any similar or successor form or declaration required by the Treasury Department, the Internal Revenue Service, or any state or local taxing authority, to implement the terms of this Agreement relative to claiming a child as a dependency exemption and/or child tax credit for federal and state income tax purposes.

14. <u>LIFE INSURANCE: OPTION TO OBTAIN</u>. Ieva shall have the option to obtain at her sole expense insurance on Todd's life for her benefit in face amount not to exceed $2,000,000. Todd will cooperate with Ieva in assisting her in obtaining such insurance, including being available for any necessary physical or other examinations in

connection with the application for any such insurance and in executing any consent or release forms that may be required.

15. HEALTH CARE COVERAGE. Todd shall maintain for the benefit of the children, and pay the costs of, his present policy of medical insurance for so long as he is obligated to support said children, and shall provide the same coverage for Ieva until the parties' divorce.

Todd shall pay all premiums, dues and assessments on said policy; shall provide Ieva, upon request, with evidence that same is in full force and effect, including the name of the insurer, the name of the plan, the plan number, and Todd's participant number; shall furnish Ieva, upon request, with appropriate claim forms and any additional information necessary to facilitate her rights under this paragraph; and shall make a request for and sign any authorization or other form permitting Ieva to be reimbursed by the insurance carrier for any expenses incurred by her. Todd shall provide Ieva with any prescription cards available to her and/or the children pursuant to said health insurance policy.

Todd shall complete any documents necessary to allow Ieva to have direct contact with the health insurance carrier for the purposes of confirming that said policy is in full force and effect covering her and/or the children and that Todd has complied with the terms of this provision.

Todd agrees to cooperate with Ieva in the event she chooses to extend and/or convert her health insurance coverage under Todd's current health insurance policy in

accordance with the provisions of COBRA or of any other similar provision of law or of the provisions of Todd's contract of insurance. Ieva shall be responsible for payment of all costs, fees and premiums in connection with said conversion or extension.

16. CASH MEDICAL SUPPORT. The parties shall pay in proportion to their gross incomes, as used for calculating the monthly child support obligation (currently 15% Ieva, 85% Todd), which may be modifiable based on a change in circumstances, any reasonable and necessary unreimbursed medical or dental expenses for each child who is the subject of the child support obligation after said costs have been submitted to insurance. If one party advances a covered cost, the other party shall reimburse for his or her share within 10 days after the paying party presents documentation showing the charge and payment therefor. If the provider has applied directly to the health insurance carrier for reimbursement, the parties shall pay to the provider his or her pro rata share when the provider deems that a payment is due and owing. Medical or dental expenses shall include but not be limited to eyeglasses, prescription medication, prosthetics, orthodontics, and mental health or developmental disabilities services including but not limited to services provided by a social worker, psychologist, psychiatrist, counselor, or therapist.

17. INCOME TAXES. The parties shall file a joint income tax returns for calendar year 2022. Any refund accruing therefrom shall be divided, and liability for the payment of additional tax, interest, and penalty shall be divided, in the following percentages: Todd 85%, Ieva 15%. Except as provided for herein, the parties agree to be

individually liable for any and all future capital gains tax liabilities and/or other income tax liability, penalties, and interest that each may incur as a result of implementation of the terms, conditions, or provisions of this Agreement, or upon sale or other transfer by either of them of assets distributed to them pursuant to the terms of this Agreement.

Todd shall have the right to claim the mortgage interest deduction and/or any other tax benefits associated with the payment of the mortgage on the 6004 Woodley Road, McLean, Virginia property for so long as he pays the mortgage on said property.

Both parties acknowledge that they have been informed that the payment of money and transfer or division of property may have adverse tax consequences to them. As per IRC Circular 230 Disclosure Notice, both parties acknowledge that to the extent that this Agreement or any attachment concerns tax matters, it is not intended to be used and cannot be used by a taxpayer for the purpose of avoiding penalties that may be imposed by law.

They further acknowledge that the most appropriate method for determining the tax consequences of this Agreement is to confer with tax accountants, tax attorneys, and/or other tax experts of their choosing, and they have been advised to do so prior to signing this Agreement. The attorneys for both parties to this Agreement have advised said parties that neither of said attorneys is a tax attorney or otherwise an expert as to income tax or other tax consequences of separation and divorce. Accordingly, each party holds his or her respective attorney harmless as to income tax and other tax issues and consequences insofar as neither attorney has offered definitive tax advice in this matter.

Each party hereto, to the extent that he or she has elected not to seek advice or counsel from a tax advisor, agrees to assume full, complete, and exclusive responsibility for the tax consequences of this Agreement.

18. OBLIGATION FOR PRIOR DEBTS. The parties stipulate and agree that except as otherwise set forth in this Agreement, there exist on the date of execution of this Agreement no joint debts and obligations. Debts and obligations in Ieva's name shall hereafter be and remain her sole and separate responsibility, and debts in Todd's name shall hereafter be and remain his sole and separate responsibility, each to save and hold the other harmless and indemnify the other as to such individually incurred debts. In the event that it is hereafter discovered that there is any credit card, line of credit, or other debt not specifically referenced herein, which is jointly titled then (a) such credit card, line of credit, and/or debt shall immediately be closed, and (b) the party who incurred the charges resulting in the existing balance of each such debt shall be responsible for the immediate payment in full thereof, and shall defend, indemnify, and hold the other party harmless as to same.

Any credit cards remaining open in the parties' joint names shall, within 30 days following execution of this Agreement by both parties, be canceled, each party to cooperate fully in requesting and effectuating such cancellation. Except as otherwise set forth in this Agreement, any amount owing as to any credit card thus canceled, shall be the obligation of the party incurring same.

19. WAIVER OF ATTORNEY FEES AND COSTS. The parties hereby waive any and all claim for counsel fees, expert fees, and court costs incurred in the negotiation and drafting of this Agreement and in the processing of their divorce. Notwithstanding the above, the parties agree that the court may order either party to pay the fees and costs of the other, in any action for enforcement or modification of this agreement, and the parties do not intend in any way to restrict the power of the court to do so.

21. ENFORCEMENT OF PROVISIONS OF AGREEMENT. The parties agree that any reasonable expenses incurred by a party in the successful enforcement of any of the provisions of this Agreement, or in taking action as a result of the breach of this Agreement by the other party, whether through litigation or other action necessary to compel compliance herewith, or to cure such breach, shall be borne by the defaulting party. Any such expenses incurred by a party in the successful defense to any such action shall be borne by the party seeking to enforce compliance. "Reasonable Expenses" as referenced herein shall include, but not be limited to, counsel fees, court costs, and expenses of travel.

22. SETTLEMENT OF FUTURE DISPUTES. Despite their separation, the parties intend to remain on civil terms. They recognize that disagreements may arise between them in the future and they agree to settle these without court intervention whenever possible. If the parties cannot resolve any controversy as to the interpretation or alleged breach of this Agreement by themselves, they agree to make a good faith effort to resolve their controversy with the assistance of their professional collaborative team by

resuming the collaborative process. If the collaborative process fails or does not appear to be productive after a good faith effort, either party may then file a petition with a court of proper jurisdiction. The parties understand that should the collaborative process fail, the parties' respective attorneys (Grant T. Moher, Esquire on behalf of Ieva and David L. Ginsberg, Esquire on behalf of Todd) may not represent them in future contested litigation.

23. BANKRUPTCY. All of the financial duties and responsibilities of the parties to each other, including payments to a third party for the benefit of one of them, specified in this Agreement were considered in determining that the amount of spousal support is appropriate or that a waiver of spousal support is appropriate, and none of the said duties and obligations shall be dischargeable in bankruptcy. To the extent that any obligation contained herein is discharged in bankruptcy, the other party shall have the right to petition a court of competent jurisdiction for spousal support.

In the event a party to this Agreement files for bankruptcy, the creditor spouse shall be entitled to attorney's fees and costs incurred in protecting his or her rights, including support, in a bankruptcy proceeding or if he or she prevails in a non-dischargeability claim.

24. FINALITY OF AGREEMENT. The parties hereby acknowledge that they are aware that the execution of this Agreement will result in an irrevocable settling of all financial matters concerning the division of property and spousal support. As to the division of property and spousal support, this Agreement can only be modified by mutual

agreement of the parties, as referenced elsewhere herein, and the Courts of the Commonwealth of Virginia are without jurisdiction to modify these provisions except by the parties' mutual agreement.

25. MODIFICATION OF TERMS OF AGREEMENT. No modification or waiver of any of the terms hereof shall be valid unless in writing and signed by both the parties.

26. NON-WAIVER. No delay or failure by either party to exercise any right hereunder, and no partial or single exercise of any such right, shall constitute a waiver of that or any other right, unless otherwise expressly agreed or provided in writing. No waiver of any breach or default hereunder shall be deemed a waiver of any subsequent breach or default of the same or similar nature.

27. GOVERNING LAW. This Agreement shall be construed and interpreted in accordance with the laws of the Commonwealth of Virginia.

28. WAIVER OF CAUSES OF ACTION. Except as otherwise set forth in this Agreement, or as necessary to enforce the rights of either party pursuant to this Agreement, each party hereby waives, releases and forever discharges the other from all causes of action, claims, rights, or demands whatsoever, in law or in equity, which either had in the past, now has, or hereafter may have against the other, except for causes of action for divorce or claims arising out of this Agreement. The parties specifically waive any and all claim to enforce any prior pendente lite or other court orders that conflict with the terms of this Agreement.

29. WAIVER OF EQUITABLE DISTRIBUTION CLAIMS. Both parties acknowledge that this Agreement resolves all property rights between them, and that such resolution accomplishes an equitable distribution of all marital property owned by either party, individually or jointly with one another or jointly with a third party. Both parties expressly waive their right to seek equitable distribution under Section 20-107.3 of the 1950 Code of Virginia, as amended, or pursuant to other prevailing laws of the Commonwealth of Virginia or of any other state, territory, jurisdiction, or country, except pursuant to the terms of this Agreement. The parties hereto have resolved all of the actual and potential, present and future, financial and property issues arising out of or in connection with their marriage, and each hereby waives, releases and relinquishes all financial and property rights except as set forth in this Agreement. All property received and retained by the parties pursuant to this Agreement shall be the separate property of the party receiving same, free and clear of any right, interest or claim of the other party, and each shall have the right to deal with and dispose of his or her separate property, both real and personal, as fully and effectively as if the parties had never been married. Moreover, each party agrees that he or she will, upon request of the other, execute and deliver such releases or assurances as may be needed or desired by the other to indicate, demonstrate, or to carry out the waivers, releases, and relinquishments of rights and interests as set forth in this Agreement.

30. WAIVER OF ESTATE CLAIMS. Except as noted in this Agreement, both parties hereby waive all of their respective rights to dower, curtesy, and to take against

and to administer the estate of the other, including, but not limited to, Virginia's "augmented estate" provisions of the 1950 Code of Virginia, as amended, including Sections 64.2-308.1 through 64.2-308.17, relative to spouse's elective share; Section 64.2-309, relative to family allowance; Section 64.2-310, relative to exempt property; and Section 64.2-311, relative to homestead allowance. Nothing herein, however, shall constitute a waiver of either party of the right to take a voluntary bequest under the will of the other.

The parties further agree that this Agreement shall operate as a revocation of all provisions in any last will and testament made by either Ieva or Todd in favor of the other spouse.

31. HOLD HARMLESS AND INDEMNIFICATION. Each party hereby indemnifies the other against liability, and holds the other harmless from, and shall pay any loss, damage or expense (including, but not by way of limitation, legal fees, court costs and disbursements), in connection with or arising out of any material default or breach of the indemnifying party's warranties, covenants, agreements, obligations and undertakings under this Agreement.

32. EXECUTION OF PROVISIONS OF AGREEMENT; FURTHER ASSURANCES. The parties expressly covenant that they will, at all times in the future, upon request of the other, his or her heirs, executors, administrators and/or assigns, execute and deliver to the other any and all further documents and assurances as may be necessary or desirable to consummate the intent of this Agreement or to enable either

party to sell, convey or otherwise dispose of his or her real or personal property, free from any rights or interests of the other therein or for the purpose of perfecting a clear title for any property referred to in this Agreement and for the purpose of giving full force and effect to the intent of the covenants, conditions and agreements set forth herein.

33. CAPTIONS. All captions contained in this Agreement have no force and effect, but are included only for ease of reference and are not meant to be part of the Agreement or of any particular provision and no such captions shall be used to interpret or construe any provision of this Agreement. No such captions shall be deemed to define, limit or describe the scope or intent of this Agreement or of any particular paragraph or section hereof, or the proper construction of same.

34. DRAFTING CONSTRUCTION. This Agreement shall in no way be construed or considered as an agreement between the parties to obtain a divorce. Instead, it is to be considered strictly as an agreement providing for amicable resolution of each party's rights and obligations arising from the marital relationship. Moreover, the parties agree and stipulate that the drafting of this Agreement was the joint product of negotiations, writings, and modifications between the parties and their respective counsel, as applicable, and as such shall not be construed against either of them in any future negotiations or litigation as to enforcement or interpretation of this Agreement.

35. DUPLICATE ORIGINALS. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

36. SEVERABILITY. If a court of competent jurisdiction shall, at any time, hold that a portion of this Agreement is invalid or unenforceable, the other provisions will not be affected thereby and will continue in full force and effect.

37. NOTICE TO PARTIES. Each party, until discharge by him or her of all obligations pursuant to this Agreement, shall at all times keep the other informed of his or her place of residence. Each party shall promptly notify the other of any change, giving the address of the new place of residence at least 30 days prior to any such relocation or move. Each shall provide the other with his or her new residence telephone number within 10 days of assignment of same by the telephone company. All such notices shall be in writing.

38. DISCOVERY WAIVED. The parties agree that this Agreement was negotiated and entered into based on each party's own personal knowledge and access to the other's books, records, and files, with little or no use of any of the discovery procedures available under the law. The parties further agree that each has considered the discovery procedures available such as written questions to the other party ("Interrogatories"), sworn statements which may be obtained from witnesses, including the other party ("Depositions"), and the availability of process to summon written papers and things ("Request for Production of Documents or Things," by way of example), but the parties have waived the potential value of the information which might be obtained with the time, effort and costs necessary to obtain such information, and have concluded that use of such discovery procedures is too time-consuming, labor intensive, and costly,

and therefore have elected not to use such procedures. Each party is satisfied that he or she has had adequate information on which to base the decision that this Agreement is a fair and adequate settlement of property rights and claims based on the parties' marriage; and is further satisfied with such disclosures. Accordingly, each party voluntarily waives and relinquishes the right of resort and use of said discovery devices.

39. ACKNOWLEDGMENT OF DISCLOSURES. The parties hereby acknowledge that each has fully acquainted the other with their means and resources; that each has informed the other in detail of their respective net worth and present income and as to the major liabilities of each; that each has disclosed to the other the identity and present value of all assets; and that neither possesses a legal or beneficial ownership interest in any undisclosed property. Each party has materially relied upon the truth and accuracy of the representations of the other in entering into this Agreement.

40. UNDERSTANDING OF AGREEMENT. Each party has fully read and understands this Agreement, is fully aware of its contents and the rights and obligations of each party, feels that the same is fair, just and reasonable, and signs the same freely and voluntarily and without any fraud, duress, or undue influence exercised by either party upon the other or by any other person or persons upon either party.

41. LEGAL ADVICE. Each party hereto represents that he or she has had independent legal advice by counsel of his or her own choosing to the extent deemed necessary by said party; that after such advice each fully understands the facts and has been fully informed of all legal rights and liabilities; that each believes this Agreement to

~~be fair, just and reasonable; and that each signs this Agreement freely and voluntarily and~~ without any fraud, duress, or undue influence exercised by either party upon the other or by any other person or persons upon either party.

42. EFFECT OF RECONCILIATION. This Agreement shall not be abrogated or invalidated by a reconciliation between the parties hereto, or a resumption of marital relations between them, unless said reconciliation or said resumption is documented by a written statement, executed and acknowledged by the parties with respect to said reconciliation or said resumption, setting forth that they are canceling this Agreement.

43. ENTIRE AGREEMENT. This Agreement contains the entire agreement between the parties; there are no other agreements, understandings or representations, written or oral, express or implied, except as specifically set out herein; and there have been no inducements from either party to any other party, express or implied, to enter into this Agreement other than those expressly set out herein.

44. TIME IS OF THE ESSENCE. Time is of the essence in the performance of all obligations under this Agreement. This provision shall not operate as a mechanism to allow either party to breach or invalidate the whole or any part of this Agreement.

45. AFFIRMATION, RATIFICATION, AND INCORPORATION IN DECREE. The parties agree that any action for divorce between them shall be subject to, and governed by, the terms of this Agreement, and that this Agreement may be presented by either party to the appropriate Court for affirmation, ratification, and incorporation in any order which may be entered in any action between the parties, the terms hereof to be

enforceable in the same manner as any provision of such order pursuant to Section 20-109.1 of the 1950 Code of Virginia, as amended. However, this Agreement shall not be merged in any such order, and instead shall independently remain in full force and effect, and shall survive any order, decree or judgment hereafter entered, and shall forever be binding and conclusive upon the parties.

46. EFFECTIVE DATE OF AGREEMENT. This Agreement shall become effective upon the date by which both parties have affixed their signatures hereto.

[THIS SPACE LEFT INTENTIONALLY BLANK]

IN WITNESS WHEREOF, the parties hereto set their hands and seals.

[signature]
IEVA M. AUGSTUMS

[signature]
DAVID TODD HARRIS

STATE OF VIRGINIA
CITY/COUNTY OF Fairfax, to-wit:

Before me, the undersigned Notary Public, in and for the above-mentioned jurisdiction, appeared this day Ieva M. Augstums whose name is signed to the foregoing document, and acknowledged her signature thereto.

Subscribed and sworn to before me this 24 day of February, 2023.

[signature]
Notary Public

My Commission Expires: 4/30/2023

MELISSA XUEYING CHO
COMMONWEALTH
REGISTRATION NO.
7951155
MY COMM. EXPIRES
04/30/2025
OF VIRGINIA
NOTARY PUBLIC

STATE OF VIRGINIA
CITY/COUNTY OF Fairfax, to-wit:

Before me, the undersigned Notary Public, in and for the above-mentioned jurisdiction, appeared this day David Todd Harris whose name is signed to the foregoing document, and acknowledged his signature thereto.

Subscribed and sworn to before me this 24 day of February, 2023.

[signature]
Notary Public

My Commission Expires: 4/30/2025

MELISSA XUEYING CHO
COMMONWEALTH
REGISTRATION NO.
7951155
MY COMM. EXPIRES
04/30/2025
OF VIRGINIA
NOTARY PUBLIC